**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Pittsburgh Gastroenterology Associates, Ltd.; and South Hills Diagnostic & Treatment Center LP, | ) ) ) Case No.: 2:25-cv-001865 |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| The Medical Protective Company of Fort Wayne, Indiana; and Beazley Insurance Company, Inc. | ) ) ) ) |
| Defendants. | ) ) **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Pittsburgh Gastroenterology Associates, Ltd. ("PGA") and South Hills Diagnostic & Treatment Center, LP ("South Hills Treatment Center") (collectively, the "Insureds"), pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332, file this Complaint against Defendants The Medical Protective Company of Fort Wayne, Indiana ("MedPro") and Beazley Insurance Company, Inc. ("Beazley"), and, in support thereof, allege as follows:

## INTRODUCTION

1.     This lawsuit stems from MedPro's refusal to provide insurance coverage each to PGA and South Hills Treatment Center under insurance policies that MedPro admits cover a class action lawsuit stemming from the alleged theft and publication of electronic data involving around 25,000 medical patients.

2.     Despite $350,000 of coverage per policy, MedPro refuses to provide more than $50,000 total under each policy, telling the Insureds that a $50,000 "per claim limit" for "total damages" covers the entire class action lawsuit, including defense costs.   The policies say no such thing and MedPro knows that.  In fact, each policy expressly states that the $50,000 limit on which MedPro pretextually relies is for each "claim" and only for "total damages," both of which are defined terms in the policies.  Beazley, as MedPro's designated manager of the policies, repeatedly misrepresented coverages for the Insureds under the MedPro policies, with the intent to deceive the Insureds into accepting the lower coverage amount.

3.     The definitions for "claim" and "total damages" make clear that the $50,000 per claim limit is multiplied by the number of claims, subject only to the $350,000 aggregate limit, and does not include defense costs, which are part of claim expenses.

4.     Despite this clear language, MedPro misleadingly limited coverage as if the separately defined terms "related claims" and "claims expenses," are included in the $50,000 limitation.   They are not.   Even after the Insureds pointed out the plain language of the policies contradicted MedPro's claims, MedPro doubled down.  Not only did it continue to refuse to provide the stated coverage, it refused to pay even the $50,000 towards the Insureds' chosen attorneys for the class action lawsuit, as punishment to the Insureds for seeking their owed coverage.

5.    Under Pennsylvania insurance law, MedPro's actions are the definition of bad faith. MedPro ignores plain language in the policies in trying to limit coverage, asserts tortured interpretations when the Insureds called out MedPro and Beazley on their deceitful coverage positions, and then attempted to pressure the Insureds into submitting to MedPro's unsupported limits on coverage.

6.    The Insureds will not be subdued by MedPro's egregious actions.  This lawsuit seeks to enforce the contractual obligations of MedPro and obtain statutory relief of attorneys' fees and punitive damages under Pennsylvania law.

## THE PARTIES

7.    Plaintiff Pittsburgh Gastroenterology Associates, LTD is a Pennsylvania Limited Liability Company with its principal place of business at 2589 Boyce Plaza Road, Pittsburgh, Pennsylvania.   It and all of its members are Pennsylvania citizens.

8.    Plaintiff South Hills Diagnostic & Treatment Center, LP is a Pennsylvania Limited Partnership with its principal place of business at 2589 Boyce Plaza Road, Pittsburgh, Pennsylvania.  It and all of its partners are Pennsylvania citizens.

9.    Defendant The Medical Protective Company of Fort Wayne, Indiana is an Indiana Corporation with its principal place of business in Fort Wayne, Indiana.

10.    Defendant Beazley Insurance Company, Inc. is a Connecticut corporation with its principal place of business in West Hartford, Connecticut.

## JURISDICTION AND VENUE

11.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiffs and Defendants, and the amount in controversy far exceeds $75,000 exclusive of interest and costs.

12.    This Court has specific personal jurisdiction over MedPro by virtue of its ongoing and continuous operations in Pennsylvania and because all the matters complained of herein occurred in Pennsylvania.  The Insureds operate exclusively in Pennsylvania, and the Policies were purchased in Pennsylvania.  In addition, the Court has general personal jurisdiction over MedPro because it has systematic and continuous contacts with Pennsylvania, and on information and belief has sold many insurance policies in Pennsylvania.

13.    This Court has specific personal jurisdiction over Beazley by virtue of its ongoing and continuous operations in Pennsylvania and because all the matters complained of herein occurred in Pennsylvania.  The Insureds operate exclusively in Pennsylvania, and the Policies were purchased in Pennsylvania.  In addition, the Court has general personal jurisdiction over Beazley because it has systematic and continuous contacts with Pennsylvania, and on information and belief has sold and managed many insurance policies in Pennsylvania.

14.    Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391 because most, if not all, of the events and omissions giving rise to this Complaint occurred in this district.

## FACTUAL BACKGROUND

***MedPro sold the Insureds insurance policies that included cyber endorsements providing $350,000 in coverage each.***

15.    PGA and South Hills Treatment Center, which are part of a gastroenterology medical practice, and the medical providers performing services as part of that practice, paid

4

MedPro hundreds of thousands of dollars in annual premiums for insurance coverage from July 2025 through July 2026. MedPro issued Policy Number C22756 to PGA and Policy Number C46906 to South Hills Treatment Center (collectively, the "Policies").[1] The Policies each contained a Cyber Liability and Data Breach Coverage Endorsement (the "Cyber Policy" or "Cyber Policies"). PGA and South Hills Treatment Center timely paid the premiums for the Policies.

16.     The Cyber Policies are standalone and subject to their own terms, conditions, definitions, and exclusions, separate and apart from the Policies.

17.     Each Cyber Policy includes a Declarations for Cyber Liability and Data Breach Coverage Endorsement. *E.g.*, Ex. A at *16 (the "Declarations").

18.     The Declarations set forth the effective date, expiration date, additional premiums, and various limitations of liability. *Id*.

19.     The Declarations for each Cyber Policy sets forth a scale of Entity Annual Aggregate Limits of Liability, depending on the number of medical providers associated with the entity as of the effective date (the "Aggregate Limit"). Both PGA and South Hills Treatment Center had between 11 and 20 providers as of the effective dates of the Cyber Policies. Accordingly, the Aggregate Limit is $350,000 each for PGA and South Hills Treatment Center.

20.     The Declarations also set forth "Per Claim and First Party Limits of Liability" for various categories of coverage ("Per Claim Limits"). For each type of coverage listed in the Per Claim Limits, there is a blank with an amount filled in, and then an associated description of the type of covered expense being limited. *Id*.

---

[1] Policy Number C22756 is attached as Exhibit A; Policy Number C46906 is attached as Exhibit B.

21.     For Enterprise Security Event and Privacy Injury Liability, there is a limit of $50,000 for "total **damages** per **claim**" (the "Privacy Injury Per Claim Limit").  *Id*. (bold in original).  The fact that the words "damages" and "claim" appear in bold indicates they are used as defined in the definition section of the Cyber Policies.

22.     "Privacy injury" is defined by the Policies to include "accidental release, unauthorized disclosure, loss, theft or misappropriation of **protected data** in the care, custody or control of an **insured entity**."  *Id*. at *28 (bold in original).

23.     "Damages" is defined in relevant part as follows:

> As respects an **enterprise security event or privacy injury claim**, a monetary judgment, award or settlement, including pre-judgment interest, and amounts that are actual, statutory, punitive, multiplied or exemplary, if permitted by law in an applicable jurisdiction, including attorneys' fees and attorneys' expense included as part of a judgment, award or settlement.  **Damages** also includes interest on any part of a judgment not exceeding the applicable limits of liability that accrues after the entry of the judgment and before the **Company** has paid or tendered or deposited the applicable judgment amount in court.

*Id*. at *25 (bold in original).

24.     The Policies define "claims expenses" separately from "damages," and in relevant part claims expenses means "reasonable and necessary expenses incurred in the investigation, adjustment, negotiation, arbitration, mediation and defense of covered **claims**."  *Id*. at *23 (bold in original).

25.     In the Insuring Clause of the Policies, it states in relevant part:

> *Enterprise Security Event and Privacy Injury Liability Coverage.*
>
> The **Company** will pay those **damages** within the applicable limit of liability, and in excess of any applicable retention, that the **Insured** becomes legally obligated to pay because of **an enterprise security event or privacy injury claim.**

*Id*. at *17 (bold in original).

6

26.    The Insuring Clause separately provides, "The **Company** will also pay all **claim expenses** in connection with such **claim**." *Id*. at *18 (bold in original).  That provision provides that the claim expenses are included in and will erode "the applicable limits of liability."

27.    In the Limits of Liability section, the Policies state as to Entity Limits:

*Entity Aggregate Endorsement Limits of Liability*

The Entity Annual Aggregate Limits of Liability stated on the Declarations of the Cyber Liability and Data Breach Coverage Endorsement is the most the **Company** will pay for all amounts covered under this Endorsement, regardless of the number of **Insureds**, **claims**, **enterprise security events**, **privacy injuries**, violations of **privacy regulations**, **extortion threats**, or **system disruptions**.

*Id*. at *19 (bold in original).

28.    The presence of the bolded term "privacy injuries" in this provision means that the Aggregate Limit applies to privacy injuries.

29.    This provision also provides that the insured is entitled to rely on the Aggregate Limit as "stated on the Declarations."

30.    The Limits of Liability section then further provides as to Per Claim Limits:

*Per Claim Limits of Liability - Enterprise Security Event and Privacy Injury Liability, Privacy Regulation Liability and PCI-DSS Assessments*

Subject to the Entity Annual Aggregate Limits of Liability, the Per Claim **enterprise security event or privacy injury claim** Limits of Liability and Per Claim **privacy regulation claim** Limits of Liability set forth on the Declarations of the Cyber Liability and Data Breach Coverage Endorsement is the most the Company will pay for all **covered damages** or **regulatory loss** and **claim expenses** in connection with each such **claim**, as applicable.

*Id*. at *19 (bold in original).

31.    This Per Claim Limits of liability provision expressly directs the Insureds to look at the "Declarations" to determine whether the Per Claim Limits are "applicable" to "damages **or** regulatory loss and claim expenses in connection with each such claim." (Bolding modified to

emphasize "or").  Because the clause "as applicable" comes at the end of the phrase "damages or regulatory loss and claim expenses with each such claims," it modifies the entire phrase.  The Insured is thus directed to look at the Declarations to determine whether a Per Claim Limit applies to damages or whether a Per Claim Limit applies to regulatory loss and claim expenses.

32.    The PGA and South Hills Treatment Center Declarations specify that the Privacy Injury Per Claim Limit is for "total **damages** per **claim**."  Thus, there is no Per Claim Limit applicable for regulatory loss and claim expenses.

33.    Under the PGA and South Hills Treatment Center Cyber Policies, the applicable limit of liability for claim expenses is the Aggregate Limit of $350,000.

34.    "Claim" is defined in the Cyber Policies as "an **enterprise security event or privacy injury claim, PCI-DSS claim** or a **privacy regulation claim**, as applicable." *Id.* at *23 (bold in original).  An "enterprise security event or privacy injury claim" is defined as "a written demand for monetary or non-monetary relief, or civil proceedings, arbitration or any alternative dispute resolution proceedings, including any appeal therefrom, alleging:  . . . An **enterprise security event**; or, . . . a **privacy injury**." *Id.* at *26 (bold in original).

35.    Separately, the Cyber Policies define "related claims" as "any **related enterprise security event or privacy injury claim** or a **related privacy regulation claim**." *Id.* at *30 (bold in original).  "Related enterprise security event or privacy injury claim" is defined as "all **enterprise security event or privacy injury claims** arising out of a single **enterprise security event** or **privacy injury**, or arising out of **related enterprise security events or related privacy injuries**." *Id*.  "Related privacy injury" is defined as "all **privacy injuries** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes." *Id*.

36.    The Per Claim Limits use the defined term "claim" and not the defined term "related claims."

37.    Section V.A.2., which relates to the Per Claim Limits of Liability uses the defined term "claim" and not the defined term "related claims."

38.    The only section of the Cyber Policies that uses the term "related claims," other than in the definitions section, is Section IX.C, which relates to the reporting of claims and events.

***Class action lawsuits were filed against the Insureds related to a data leak.***

39.    In August 2025, actors hacked into one of the servers used by the Insureds to store certain patient information.

40.    On August 21, 2025, a class action lawsuit was filed against PGA in the Allegheny County Court of Common Pleas, asserting multiple claims related to the data leak on behalf of around 25,000 patients, alleging that the patient information was taken by the hackers and published on the "dark web."  Shortly after the first lawsuit, six other class actions lawsuits were filed against PGA in the same court, all based on the same Data Leak.[2]  (Collectively the "Data Leak Class Action Litigation").

***MedPro acted in bad faith.***

41.    On August 20, 2025, the Insureds' counsel notified MedPro about the first complaint filed in the Class Action Litigation and requested defense and coverage as per the terms of the Cyber Endorsement.  (The August 20, 2025 Notice Letter, attached as Exhibit C). Subsequently, the Insureds' counsel notified MedPro of the additionally filed class action lawsuits. MedPro assigned Beazley to manage the claims.

---

[2] The Court of Common Pleas consolidated the Data Leak Class Action Litigation under Case Number GD-25-009036.

42.    On September 16, 2025, MedPro, through its coverage counsel, issued its coverage letter to the Insureds.  (The "September 16 Coverage Letter," attached hereto as Exhibit D.) MedPro acknowledged that the Cyber Policies for both PGA and South Hills Treatment Center applied to the Data Leak Class Action Litigation generally.  According to MedPro, it would defend and cover only PGA with respect to the Data Leak Class Action Litigation since, at the time, PGA was the only named defendant in the class action lawsuits.  Despite the clear applicability of the Cyber Endorsement, MedPro stated that coverage was under a reservation of rights.

43.    In the September 16 Coverage Letter, which was issued by coverage counsel on behalf of Beazley, MedPro stated that it would provide PGA with only $50,000 of total coverage that included both defense costs and damages.  According to MedPro, the Privacy Injury Per Claim Limit applies to claims expenses, including defense costs, and not just damages.  *See* Ex. D at *3 ("All the coverages provided under the Policies pursuant to the Cyber Endorsement are also subject to a $50,000 per claim or total expense limit. To that end, the per claim limit is the most MedPro will pay for covered damages and claim expenses incurred in connection with a claim, while the total expense limits are the most MedPro will pay for each such covered expense." (bold omitted)).

44.    In the September 16 Coverage Letter, MedPro did not acknowledge, let alone discuss, that the Declarations expressly limited the Privacy Injury Per Claim Limit of $50,000 to only "total **damages**" and did not refer to claim expenses or defense costs.

45.    After receiving the September 16 Coverage Letter, on September 18, 2025, the Insureds' attorney called MedPro's coverage counsel to discuss MedPro's claimed coverage.  The Insureds' attorney pointed coverage counsel to the language in the Declarations that the Privacy Injury Per Claim Limit is for "total damages," and explained that the Privacy Injury Per Claim Limit does not refer to claims expenses or defense costs.

46.    MedPro's coverage counsel told the Insureds' attorney that he agreed that the correct reading of the Declarations was that the Privacy Injury Per Claim Limit did not include claim expenses or defense costs.  MedPro's coverage counsel said he would speak to MedPro and Beazley about the language.

47.    During the September 18 phone call, the Insureds' attorney and MedPro's coverage counsel also discussed MedPro's decision that it would only defend and provide coverage for PGA because it was the only named defendant.  The Insureds' attorney stated that it would be detrimental and inefficient for MedPro to refuse to defend and cover South Hills Treatment Center because a settlement would not be feasible without including South Hills Treatment Center as a releasee.  The Insureds' attorney also stated that denying defense and coverage now would only delay the inevitable because the class action plaintiffs would learn of South Hills Treatment Center and its insurance coverage since they would seek discovery of any applicable insurance policies.

48.    MedPro's coverage counsel told the Insureds' attorney that the class action plaintiffs might not find out about coverage for South Hills Treatment Center.  MedPro's coverage counsel stated to the Insureds' attorney that the Insureds should withhold the South Hills Treatment Center MedPro policy from the plaintiffs on the theory that it was irrelevant.  The Insureds' counsel responded that he did not believe that was an appropriate position to take and that it would not be in the Insureds' best interests anyway.

49.    MedPro's coverage counsel stated that he would talk to MedPro about the issues that the Insureds' attorney raised on the September 18 call and circle back.

50.    On September 25, 2025, MedPro's coverage counsel emailed the Insureds' counsel that MedPro refused to provide more than $50,000 in coverage for defense costs and damages combined, "notwithstanding the fact that the Declarations reference only **damages** in connection

with the per claim limit of liability." (Bold in original.) In other words, MedPro refused to recognize the plain language of the Cyber Policies that defense costs were not subject to the Privacy Injury Per Claim Limit.

51.    MedPro's coverage counsel also claimed in his email that the claims raised in the class action lawsuit constituted just a single claim under the Cyber Policies because "the complaints filed in the Litigation have the Cyber Incident as a 'common nexus.'" MedPro was misleadingly referring to the definitions of "related claims" and "related privacy injury" in the Cyber Policies.

52.    MedPro knew that the Cyber Endorsements did not use the terms "related claims" or "common nexus" in connection the limits on liability, including the Privacy Injury Per Claim Limit. In fact, the only place the Cyber Policies referred to those terms was in the section related to the Insureds reporting claims to MedPro. MedPro made this misleading statement to unreasonably deny the Insureds owed coverage by attempting to limit coverage to $50,000, when it knew that the Cyber Policy did not include that limitation and that the $350,000 Aggregate Limit was the only applicable limit.

53.    Like MedPro, Beazley also knew that the Cyber Policies did not use the terms "related claims" or "common nexus" in connection the limits on liability, including the Privacy Injury Per Claim Limit. On information and belief, Beazley directed coverage counsel to misleadingly state coverage to the Insureds with the intent that the Insureds would accept the lower coverage.

54.    On October 2, 2025, the Insureds' attorney sent MedPro's coverage counsel a letter, stating that MedPro's denial of $350,000 in coverage for PGA was in bad faith and that if necessary, the Insureds would seek judicial relief. (Bad Faith Letter attached as Exhibit E.)

55.    On October 20, 2025, interim co-lead counsel for the class action litigation amended one of the complaints to include South Hills Treatment Center as a defendant. The Insureds notified MedPro of this amendment and reiterated their request for defense and coverage under the Policies.

56.    After notifying MedPro that South Hills Treatment Center was added as a defendant in the class action litigation, the Insured's attorney emailed MedPro's coverage counsel reiterating the unreasonableness of MedPro's coverage position under Pennsylvania law:

> The Insureds already addressed MedPro's unreasonable position that the limit of "$50,000 total **damages** per **claim**" language set forth on the Declarations Page of each Policy for Pittsburgh Gastroenterology Associates and SHDTC does not actually mean the limit on "total damages per claim," but rather means the limit on both damages and defense costs. In its latest correspondence, MedPro does not point to any provision that in any way contradicts the straightforward language of the Declarations Policy, let alone unambiguously changes it. Even if it had, I direct MedPro to what Pennsylvania Supreme Court Justice Hutchinson said in his lengthy concurrence in an often-cited decision on insurance coverage:

>> Superior Court's reliance on the policy declaration rather than the exclusions seems sound wherever it is possible to do so, since the declarations page is not completely pre-printed form and thus the insured is more likely to see, read and understand it. In addition the coverages set forth in the policy declarations are normally what the parties actually bargain for and discuss. An insurance carrier should not be permitted to take a bargain plainly promised in the declarations and remove it by artfully drafted and obscure exclusions buried in the text of the policy.

> *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300 (Pa. 1983) (concurring).

> Thus, even under MedPro's stretched interpretations of other provisions in the Policies, MedPro "should not be permitted to take a bargain plainly promised in the declarations and remove it by artfully drafted and obscure exclusions buried in the text of the policy." In fact, on our initial call, you agreed that the Declarations Page did not limit defense costs to $50,000 for Enterprise Security Event and Privacy Injury Liability and that the limit applied only to damages. Only after you spoke to MedPro, did your interpretation apparently change.

57.     On October 29, 2025, MedPro's coverage counsel issued MedPro's South Hills Treatment Center coverage letter to the Insureds, which he stated was sent on behalf of Beazley, who was managing the claims on behalf of MedPro. (The "October 29 Coverage Letter" is attached hereto as Exhibit F.) In its coverage letter, MedPro repeated the same unreasonable coverage positions for South Hills Treatment Center that it took with PGA, contradicting the plain language of the Cyber Policies. According to MedPro, it is only required to provide $50,000 of total coverage to South Hills Treatment Center, including both defense costs and damages for the entire class action lawsuit. Once that $50,000 is exhausted, MedPro would abandon South Hills Treatment Center, as it would PGA.

58.     On November 17, 2025, the Insureds' attorney emailed MedPro's coverage counsel expressing disappointment that MedPro refused to recognize the plain language of the Cyber Policies, and specifically addressed MedPro's unsupported position that the entire class action litigation was defined as a single claim under the Cyber Policies:

> I note that it appears MedPro, in your prior correspondence, is misstating the available coverage for the class action lawsuit, even under its theory that defense costs are part of the per claim limitation on "damages." As MedPro is aware, the class action involves more than 20,000 individual patient claims against the Insureds. While your earlier correspondence states that the $50,000 per claim limit applies to the entire class action lawsuit because the claims share a "common nexus," whether or not the claims share a common nexus is irrelevant to the per claim limits of liability as defined in the policies. MedPro appears to be referring to the definition of "Related claims," which through the definition of "Related privacy injury," uses the language "common nexus." Attempting to deny the Insureds their owed coverage, MedPro glosses over the fact that Section V(A)(2) "Per Claim Limits of Liability" does not use the term "Related claims." In fact, Section V(A) specifically uses only the defined term "claims." MedPro certainly knew to use the term "Related claims" when it in fact meant claims sharing a common nexus. In the "Reporting of Claims and Events" provisions, MedPro used the term "Related claims" to specify when subsequent related claims are deemed to have occurred and been reported. Because MedPro did not use the term "Related claims," in Section V(A)(2), a straightforward reading of the policies means that the class action lawsuit, which includes thousands of claims, means that there is $350,000, not $50,000, of coverage per entity (for a total of $700,000 combined

14

damages and defense costs coverage for Pittsburgh Gastroenterology Associates and South Hills Diagnostic & Treatment Center).

59.    MedPro did not even respond to the Insureds' November 17 email or the fact that the Personal Injury Per Claim Limit did not include "related claims," as defined in the Cyber Policies.

***MedPro punishes the Insureds for seeking their owed coverage.***

60.    When the Data Leak Class Action Litigation was initiated, insurance panel defense counsel approved by MedPro ("Insurance Panel Counsel") represented PGA in the litigation.  Due to MedPro's actions and statements regarding coverage, including MedPro's coverage counsel's statement that PGA should withhold relevant insurance policies from the class action plaintiffs, the Insureds soon became concerned that Insurance Panel Counsel was not representing their best interests in the litigation.  Specifically, the Insureds were concerned that panel counsel would be steered by MedPro to litigate the class action in a manner designed to avoid coverage for the Insureds.  In fact, when the Insureds' attorney attempted to discuss this concern with Insurance Panel Counsel, they repeatedly rebuffed even discussion of coverage issues, stating that Insurance Panel Counsel could not take positions adverse to MedPro.

61.    In addition to the conflict concern with Insurance Panel Counsel, PGA understood that MedPro would abandon it as soon as the $50,000 limit that MedPro unreasonably applied was exhausted.  As MedPro well knew, that $50,000 limit would quickly be exhausted, long before the Data Leak Class Action Litigation could be resolved, leaving the Insureds to foot the bill for defense and any damages payment.  In fact, by the end of September 2025, Insurance Panel Counsel had already billed more than $15,000 in fees in connection with the litigation and had not made any court appearances, filed any response to the complaints, or even reviewed the compromised data at issue.  In addition, the attorneys for the Insurance Panel Counsel were located

in Philadelphia and Florida, hundreds and thousands of miles respectively from Allegheny County where the Data Leak Class Action Litigation is pending.

62.    On September 30, 2025, the Insureds informed Insurance Panel Counsel and MedPro that Insurance Panel Counsel's representation was terminated due to a conflict and that the Insureds' attorney would represent PGA in the Data Leak Class Action.

63.    As stated above, on October 2, 2025, the Insureds' attorney sent MedPro's coverage counsel a letter describing MedPro's bad faith coverage determination and indicating that the Insureds would seek judicial relief if necessary.  The Insureds also stated that they had replaced Insurance Panel Counsel with their chosen attorney for three reasons:

> First, even for the single policy MedPro acknowledges covers the Class Action Litigation, MedPro did so under a reservation of rights. It is unclear on what basis MedPro could ever deny defense or coverage on straightforward class action lawsuit against Pittsburgh Gastroenterology Associates asserting claims arising out of the data breach, but MedPro's reservation of its rights entitles the Insureds to choose their own independent counsel. Second, as described above, MedPro has refused to provide any meaningful defense by taking the unsupportable position that the Pittsburgh Gastroenterology Associates Policy limits defense costs to $50,000. Third, MedPro refuses to provide any coverage for South Hills Diagnostic & Treatment Center LP ("SHDTC") on the mere basis that it is not yet a named defendant in the class action lawsuit. Yet, nothing in the Policy requires an Insured to be a named defendant in a complaint before the duty to defend attaches. To the contrary, the Policy for SHDTC provides that the Insurer has the "duty to defend a covered enterprise security event or privacy injury claim," which is defined simply as a "written demand for monetary or non-monetary relief, or a civil proceeding . . . alleging . . . a privacy injury." As MedPro acknowledges, a civil proceeding has been filed alleging a privacy injury. Not only does MedPro's refusal to defend SHDTC mean it has no say in who SDHTC selects to defend it, MedPro's unreasonable position has created an inherent conflict for any insurance panel counsel in representing Pittsburgh Gastroenterology Associates.

Ex. E at *3.

64.    On October 3, 2025, the Insureds' attorney spoke with MedPro's coverage counsel, and coverage counsel stated that MedPro would respond to the October 2 bad faith letter by October 8.  October 8 came and went with no response from MedPro.

16

65.     Finally, on October 14, 2025, MedPro responded to the Insureds October 2 letter. In MedPro's response, it stood by its unreasonable stance that it would not pay more than the $50,000 Privacy Injury Per Claim Limit.  In addition, MedPro stated that it refused to pay the Insureds' chosen attorneys anything for defending the Insureds in the Data Leak Class Action Litigation.  As pretext, MedPro claimed that in its opinion there was no conflict with panel counsel and that MedPro's right to choose panel counsel "allow[s] it to mitigate any potential future indemnification obligations."

66.     MedPro's real reason for refusing to pay even the $50,000 limit towards the Insureds' chosen attorney was to punish the Insureds for calling MedPro out on its bad faith actions, discourage the Insureds from seeking their rights through the courts, and force the Insureds to use MedPro's chosen counsel so it could control the litigation to the Insureds' detriment.  Other than in conclusory fashion claiming there was no conflict for panel counsel, MedPro offered no explanation as to how panel counsel could represent the Insureds' best interests while also refusing to take or even consider positions that would be opposed to MedPro's unreasonable coverage determinations.

67.     In any event, MedPro knew that the $50,000 limit it claims applies would be exhausted long before any damages were paid.  In fact, the $50,000 would be woefully short of covering the defense fees needed to defend the Data Leak Class Action Litigation even if the case was resolved in the early stages.  Thus, under MedPro's bad faith coverage decision, MedPro would simply pay $50,000 for its chosen counsel to litigate the case for a couple months, then MedPro would abandon the Insureds with counsel the Insureds did not want and provide no coverage for any further defense or damages.  MedPro's assertion that it was attempting to

"mitigate any potential future indemnification obligations" is nonsensical since under MedPro's unreasonable assertions, there would be no coverage left for damages.

**MedPro acted in bad faith for additional reasons.**

68.    On information and belief, in addition to refusing the Insureds the coverage they are owed for the purposes of avoiding payment to the Insureds in connection with the Data Leak Class Action Litigation, MedPro is taking bad faith and unreasonable positions to avoid exposure on thousands of other insurance policies.

69.    On information and belief, MedPro has issued thousands of policies with cyber liability and data breach endorsements containing similar language to the Cyber Policies issued to the Insureds.

70.    On information and belief, MedPro is concerned that if it acknowledges the plain reading of the Cyber Policies for the Insureds regarding the Privacy Injury Per Claim Limit, it will be required to apply that same reading to the many other policies that it has issued.

71.    On information and belief, MedPro has taken the same unreasonable interpretation of policies that it takes here in the past and intends to continue to take those unreasonable positions in the future.

**MedPro's actions prejudice and injure the Insureds.**

72.    The Insureds paid MedPro tens of thousands of dollars so that in the event of a data leak, such as the one alleged in the Data Leak Class Action Litigation, the defense and any damages would be funded up to the policy limits of $350,000 for each of them.

73.    The Insureds are part of a small medical practice, and self-funding the defense of the Data Leak Class Action Litigation is a significant burden.  By denying the Insureds the coverage that MedPro agreed to provide for hefty premiums, MedPro has forced the Insureds to

18

self-fund their defense.  The Insureds have paid tens of thousands of dollars to defend themselves when MedPro was obligated to provide that defense.

74.     On information and belief, MedPro is forcing the Insureds to self-fund their defense to both punish the Insureds for asserting their rights under the Cyber Policies and to cause the Insureds to relent from seeking the coverage to which they are entitled.

75.     In addition, MedPro's and Beazley's actions have directly caused the Insureds to spend significant time and money seeking the coverage that they are clearly owed under the Cyber Policies, yet which MedPro has denied.  Moreover, MedPro's and Beazley's actions have unnecessarily complicated the Data Leak Class Action Litigation.

## **FIRST CAUSE OF ACTION**
### **(Declaratory Relief – Duty to Defend and Cover Damages – Against All Defendants)**

76.     The Insureds incorporate herein the allegations in paragraphs 1-75 of this Complaint.

77.     The Data Leak Class Action Litigation asserts claims against PGA and South Hills Treatment Center that constitute privacy injury claims under the definitions contained within the Policies.

78.     The respective Cyber Policy for PGA and South Hills Treatment Center requires MedPro to defend PGA and South Hills Treatment Center and pay their defense costs.  As a result, MedPro has a duty to defend the Insureds and pay their defense costs.

79.     By its clear terms, the only applicable limit in the Cyber Policies for coverage for privacy injury claims expenses is the $350,000 Aggregate Limit.

80.     In addition, the Privacy Injury Per Claim Limit of $50,000 for damages applies to individual claims, and not singularly to "related claims," as stated in the respective Cyber Policies for PGA and South Hills Treatment Center.  There are more than seven claims at issue in the Data

19

Leak Class Action Litigation. Accordingly, the only limit to damages coverage for PGA and South Hills Treatment Center for the Data Leak Class Action Litigation is the $350,000 Aggregate Limit.

81.    Despite the Insureds' clear right to coverage for claims expenses and damages up to $350,000 each for PGA and South Hills Treatment Center, MedPro has refused to admit its contractual obligation to pay these claims expenses up to the Aggregate Limit.

82.    Under 28 U.S.C. § 2201, an actual and justiciable controversy exists between the Insureds and MedPro and Beazley regarding (i) the limits applicable Data Leak Class Action Litigation; and (ii) whether claims expenses and defense costs erode those limits.

83.    Prompt relief is needed to protect the Insureds' rights under the Cyber Policies.

84.    A declaratory judgment establishing the applicable limits and their application to the Data Leak Class Action Litigation would resolve the controversy regarding MedPro's defense cost and damages coverage obligations and Beazley's obligations as the manager of the Policies.

85.    In accordance with 22 U.S.C. § 2201, PGA and South Hills Treatment Center are entitled to a declaration of their contractual rights and MedPro's contractual duties under the Cyber Policies, including a declaration that MedPro has a duty to pay the Insureds' accumulated and ongoing defense costs to the claims in the Data Leak Class Action Litigation and the $350,000 Aggregate Limit is the relevant limit for damages and claims expenses in connection with the Data Leak Class Action Litigation.

## SECOND CAUSE OF ACTION
### (Common Law Bad Faith – Against MedPro)

86.    The Insureds incorporate herein the allegations in paragraphs 1-85 of this Complaint.

87.    In exchange for annual premiums, MedPro agreed to insure PGA and South Hills Treatment Center for up to $350,000 each for privacy injury claims of the type alleged in the Data Leak Class Action Litigation.

88.    Implied in every insurance policy is a covenant that the insurer will act in good faith and deal fairly with its insured, that the insurer will do nothing to interfere with the insured's right to receive benefits under the policy, that the insurer will give as much consideration to the interests of its insured as it does its own interests, that the insurer will exercise diligence, good faith, and fidelity in safeguarding the insured's interests, that the insurer will deal ethically with its insured and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage.

89.    Contrary to these principles, MedPro acted in bad faith towards the Insureds by ignoring plain language in the Cyber Policies, misleadingly referring to terms in the Cyber Policies that do not apply, and asserting tortured interpretations of other policy provisions in order to financially benefit itself by limiting the amount of defense and coverage it would provide the Insureds.

90.    In addition, MedPro acted in bad faith by refusing to pay even the coverage and defense it agreed to provide to cover the Insureds' defense costs for the Insureds' chosen attorneys.

91.    MedPro denied the Insureds the full coverage to which the Policies entitled the Insureds for the purpose of consciously, purposefully, and maliciously withholding policy benefits and placing its own interests above its insured.

92.    MedPro continues to violate its fiduciary responsibility to the Insureds by acting only in the best interests of MedPro.

93.    MedPro's actions have caused and will continue to cause the Insureds to suffer damages, including paying for its own defense costs, interfering with resolution of the Data Leak Class Action Litigation, and paying fees to address MedPro's bad faith determinations.

94.    The Insureds request that the Court enter judgment against MedPro for compensatory damages in excess of $75,000 to be determined at trial plus punitive damages, attorney's fees, pre-judgment and post-judgment interest, and such other relief as the Court deems proper.

**THIRD CAUSE OF ACTION**
**(Statutory Bad Faith – Against MedPro)**

95.    The Insureds incorporate herein the allegations in paragraphs 1-94 of this Complaint.

96.    A victim of an insurer's bad faith may seek redress in Pennsylvania under 42 Pa. Cons. Stat. § 8371 ("Section 8371").  Section 8371 provides specific statutory relief in the form of punitive damages and interest where, as here, the insurer has acted in bad faith towards the insured.

97.    Under Section 8371, bad faith includes an insurer's frivolous or unfounded refusal to pay which can be established by showing that the insurer lacked a reasonable basis to deny the insured coverage and that, in taking such action, the insurer knew or recklessly disregarded its lack of a reasonable basis for denying that claim.

98.    MedPro acted in bad faith towards the Insureds, including by asserting a manifestly unreasonable interpretation of the Cyber Policies to justify its refusal to provide the Insureds with up to $350,000 in coverage each for claims expenses and damages.

99.    MedPro's baseless denial of coverage has already caused the Insureds to suffer financial harm while potentially jeopardizing its defense against the claims in the Data Leak Class Action Litigation.

100.    MedPro continues to violate its fiduciary responsibility to the Insureds by acting only in the best interests of MedPro.

101.    As a result of MedPro's bad faith, the Insureds have and will suffer substantial monetary damages, including compensatory damages in the amount of past, present, and future defense costs along with potential damages resulting from a possible adverse verdict.

102.    In addition, the Insureds are entitled to statutory exemplary damages sufficient to punish MedPro for its willful tortious actions along with special statutory interest and attorney's fees and costs.

103.    The Insureds request that the Court enter judgment against MedPro in an amount in excess of $75,000 for compensatory and punitive damages, attorney's fees and costs, special statutory interest, and such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
### (Negligence – Against Beazley)

104.    Beazley managed the Cyber Policies and coverage determinations under those policies in connection with the Data Leak Class Action Litigation.

105.    Beazley, by undertaking the responsibility to manage coverage of claims against the Insureds and the Cyber Policies, assumed a duty to exercise reasonable care in performing those administrative functions.

106.    Beazley's duty extended to interpreting the Cyber Policies and making coverage determinations consistent with the language of the Cyber Policies.

107.    Beazley failed to exercise the required standard of care when it issued a determination that a $50,000 limit applied to both damages and defense costs in connection with the Data Leak Class Action Litigation.

108.    Beazley failed to exercise the required standard of care when it informed PGA and South Hills Treatment Center that a $50,000 limit applied to both damages and defense costs in connection with the Data Leak Class Action Litigation.

109.    The Insureds have suffered actual loss and damages due to Beazley's negligence, including the Insureds having to self-fund their defense to the Data Leak Class Action Litigation and spending time and expense to seek their owed coverage under the Cyber Policies.

110.    A causal connection exists between Beazley's breach of its duties and the Insureds' injuries, including the Insureds having to self-fund their defense to the Data Leak Class Action Litigation and spending time and expense to seek their owed coverage under the Cyber Policies.

### FIFTH CAUSE OF ACTION
#### (Fraud – Against Beazley)

111.    Beazley's statements to the Insureds that MedPro's coverage and defense for the Data Leak Class Action was limited to $50,000 for each of them under the Cyber Policies was a material misrepresentation regarding the Insureds' rights under the Cyber Policies. The coverage determination was central to the insurance coverage and directly affected the Insureds' rights under the Cyber Policies.

112.    Beazley's statements to the Insureds that MedPro's coverage and defense for the Data Leak Class Action Litigation was limited to $50,000 for each of them under the Cyber Policies was made falsely and with knowledge, or reckless disregard, for the falsity of the statements.  The language of the Cyber Policies is clear that only a $350,000 limit applied to the Data Leak Class Action Litigation, not a $50,000 limit.

113.    By limiting defense and coverage to $50,000, Beazley intended to mislead the Insureds regarding the scope of coverage and to induce the Insureds to accept the wrongful limited coverage.

114.    The Insureds have suffered actual loss and damages due to Beazley's fraud, including the Insureds having to self-fund their defense to the Data Leak Class Action Litigation and spending time and expense to seek their owed coverage under the Cyber Policies.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

a) A declaratory judgment that PGA and South Hills Treatment Center are entitled to $350,000 of coverage each under the Cyber Policies;

b) An award of all appropriate relief including compensatory and punitive damages in an amount to be proven at trial;

c) An award of attorneys' fees; and

d) Such other relief as the Court deems just and proper.

### JURY DEMAND

The Insureds demand a trial by jury on all issues so triable.

Dated: December 3, 2025                    Respectfully submitted,

*/s/ Jeremy D. Engle*

Jeremy D. Engle (PA I.D. 324008)
engle@marcus-shapira.com
Matthew B. Simon (PA I.D. 331106)
simon@marcus-shapira.com
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758

*Counsel for Plaintiffs*